IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHANNE THURMAN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JO ANNE BARNHART | : | NO. 05-5447 |

<u>MEMORANDUM AND ORDER</u>

**NORMA L. SHAPIRO, S.J.**                                                                SEPTEMBER 18, 2007

      Johanne Thurman seeks judicial review of the Social Security Administration's ("SSA") decision denying disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. § 405(g). United States Magistrate Judge M. Faith Angell ("Judge Angell") filed a Report and Recommendation ("R&R") concluding that substantial evidence supported the Administrative Law Judge's ("ALJ") finding that Thurman was not disabled and could engage in substantial gainful activity. The Magistrate Judge recommended that summary judgment be granted in favor of the Commissioner. Thurman filed timely objections. For the reasons discussed in this memorandum, the R&R is approved as modified and the claim is denied.

**I.     PROCEDURAL HISTORY**

      Thurman filed her DIB claim on February 25, 2003. She was denied DIB at the initial determination stage, and requested a hearing before an ALJ. ALJ Christine McCafferty decided Thurman was not disabled and not entitled to DIB. (R. 25-26.) Thurman's request for review by the SSA Appeals Council having been denied, the ALJ's decision was the final disposition of the Commissioner. (R. 6.) Thurman filed an action for judicial review of the Commissioner's decision. Thurman and the Commissioner filed cross-motions for summary judgment. In her motion for summary judgment, Thurman argues: (1) the ALJ should have given more weight to

the opinion of Dr. Knox, who performed a consultative exam; and (2) since the ALJ found a discrepancy between Dr. Knox's empirical observations and his conclusions, the ALJ had an obligation to contact Dr. Knox for an explanation.  The Commissioner argues substantial evidence supported the ALJ's rejection of Dr. Knox's opinion and the ALJ's finding of non-disability.  This action was referred to Judge Angell for a R&R, to which Thurman filed timely objections.

## II.   BACKGROUND

At the time of the ALJ decision, Thurman was a 49 year-old high school graduate.  Her past work experience consisted mainly of her employment as a supermarket cashier for twelve and a half years.  (R. 44.)  She alleges a disability onset date of July 23, 2001, as a result of hand surgery.  (R. 17.)

### A.   Medical Evidence

On May 10, 2001, Dr. Stepanuk, an orthopaedic surgeon, saw Thurman for pain in her right arm and numbness in her right little and ring fingers.  (R. 186.)  He diagnosed Thurman with right lateral epicondylitis, and prescribed a tennis elbow brace, instruction in strengthening exercises, and an injection in the right lateral epicondyle.  (R. 187.)  On May 31, 2001, Dr. Stepanuk diagnosed Thurman with lateral epicondylitis right elbow and right carpal tunnel syndrome, which had increased in severity with the repetitive use of her hand.  (R. 183.)  On August 2, 2001, Dr. Stepanuk recommended that Thurman not return to a normal cash register but work at a self-checkout register.  (R. 180.)  On September 6, 2001, Dr. Stepanuk recommended surgery on Thurman's lateral epicondyle.  (R. 179.)  Thurman had elbow surgery on October 8, 2001, and Dr. Stepanuk opined Thurman was "doing fairly nicely."  (R. 177.)  Dr.

Stepanuk continued to treat Thurman for pain in her right elbow, stiffness in her right and little fingers, and numbness and paresthesias in the right hand. (R. 173.) On March 7, 2002, Dr. Stepanuk opined Thurman was "unable to return to her regular duties at this time and probably will not be able to do so in the future."

On April 28, 2002, Dr. Stepanuk found physical therapy had been helpful; Thurman had a full range of elbow motion, decreased sensation to light touch to the right index finger, full extension, a slightly stronger grasp, and good pulses. (R. 171.) On subsequent visits, Thurman continued to report right elbow pain and numbness in her right hand. Dr. Stepanuk noted he could not account for the tightness and pain in Thurman's upper extremity, and recommended referral to a hand surgeon. (R. 165.) On October 24, 2002, Dr. Stepanuk noted Thurman had pain in the right elbow about the lateral epicondyle of the elbow, decreased sensation to the right hand, and decreased motion to her fingers, but she had a full elbow range of motion, no instability or atrophy, and normal coordination. Id.

On September 13, 2002, Thurman struck her knee on the metal attachment to a bus seat when the bus swerved to avoid a collision. (R. 269.) Four days later, Dr. King saw Thurman for right knee pain. Id. An x-ray of Thurman's right knee on September 19, 2002, showed "slight degenerative changes." (R. 289.) Dr. King treated Thurman until March 18, 2003, when he discharged her from active care and advised her to continue home exercises. (R. 280.)

On June 16, 2003, Dr. Knox performed a consultative examination for Thurman's right elbow pain, weakness in her fingers, arthritis involving her major weight bearing joints, and stiffness in her ankles and knees. (R. 191.) He reported Thurman: was overweight, was being treated for depression, was hypertensive, had arthritis, had insomnia, and suffered from anxiety

attacks. (R. 191-92.) He noted Thurman had limited extension and flexion on both ankles, crepitus in both knees, full range of motion of both knees, swelling in the right wrist joint and tenderness with abduction and rotation of both hip joints. (R. 193.) According to Dr. Knox, Thurman could only abduct the right and left shoulder to 120 degrees, and she could not extend the elbow more than 45 degrees. Id. Dr. Knox reported Thurman was not able to walk without the use of a cane or get up on the examining table because of her weight and arthritis. Id. He also noted Thurman appeared "somewhat depressed" but had no focal neurological deficits. Id.

Dr. Knox opined Thurman could stand/walk for a maximum of one hour in an 8-hour day and sit for a maximum of two hours in an 8-hour day. (R. 199.) He found Thurman could lift up to 10 pounds frequently and up to 20 pounds occasionally, with unlimited pushing and pulling. Dr. Knox stated Thurman's impairments affected her ability to reach, handle, finger and feel, and concluded she could never bend, kneel, stoop, crouch, balance or climb. (R. 200.)

On June 25, 2003, Thurman was a passenger in a vehicle which was rear-ended. (R. 281.) The next day, Thurman complained to Dr. King of "pain in the neck, left shoulder, left rib cage, mid back, low back and left hip pain," and "radiating pain in her left upper extremity." Id. Dr. King reported: Thurman's pain was "increased by holding the head in one position for any period of time"; there was mid back pain, achiness and stiffness "exacerbated by maintaining one position for extended periods of time"; "[p]rolonged sitting or standing also produces increased discomfort"; "[s]itting in one position for extended periods of time as well as bending and twisting exacerbates the low back pain and stiffness"; and "pain and achiness noted over the left hip region which is exacerbated by arising from a sitting position, weight bearing or ambulation." Id. Dr. King opined Thurman was "totally disabled and unemployable." (R. 282.)

On July 15, 2003, Dr. Wander, a non-examining physician, found Thurman suffered pain in her right elbow, lateral epicondylitis of the right elbow, right carpal tunnel syndrome, crepitus of her knees, knee pain, obesity, and a pinched nerve. She found shoulder range motion of 120 degrees and extension of Thurman's right elbow of 45 degrees. Dr. Wander concluded Thurman could stand and/or walk a total of 6 hours in an 8 hour day and sit with normal breaks for a total of 6 hours in an 8 hour day. (R. 201-08.) She found Dr. Knox's RFC assessment "imposes greater restrictions than the physical examination and medical evidence support." (R. 207.)

An MRI of Thurman's cervical spine on September 29, 2003, showed "no evidence of cervical disc herniation," "no evidence of cervical spinal canal stenosis or foraminal narrowing," "normal stature, signal and alignment" of the vertical bodies, and a "normal" cervical spinal cord. (R. 291.) An MRI of the lumbar spine revealed "[m]ild degenerative disc disease at L3/4 and L4/5," but "no disc herniation at these levels." (R. 292.)

B.      Hearing Testimony

At the hearing before the ALJ, Thurman testified she stopped working as a cashier because the repetitive activity hurt her arm. (R. 45.) Her arm surgery did not help, and she felt pain in her elbow, hand, and between her elbow and wrist. (R. 46.) She also testified her left hand was beginning to bother her. (R. 47.) Thurman suffered from dizzy spells at least three times a week (R. 48.); the worst dizzy spells lasted three to four hours and occurred approximately three times a month. (R. 52-53.) Thurman stated she had a stiff neck, and pain in her left shoulder, right knee, hips, and down her back. (R. 53.) She had to walk with a cane and could not stand for 20 minutes without using it. (R. 64.) Her hands and ankles were swollen. (R. 66.) According to Thurman, when she sat for several hours, her back stiffened and began to

hurt; she would get up and walk around before sitting back down. (R. 68-69.) She estimated she was able to remain seated continuously for an hour at a time. (R. 70.) If she remained standing in one place, her back would begin to hurt within four to six minutes. Id. Thurman testified she could lift slightly less than five pounds with her right hand. (R. 71.)

Thurman also testified about her daily activities at her hearing before the ALJ. She reported that on a typical day, she woke up at 4:30 a.m. because of her pain and did stretches. (R. 56.) She would take a shower, pray, and meditate for approximately an hour, then speak with prayer partners on the phone until 7:00 a.m. (R. 56-57.) Thurman would then wake up her younger daughter and prepare a pot of tea. (R. 57-58.) After Thurman's daughters left for school, Thurman would watch five hours of television, read sporadically for approximately two and a half hours, and walk back and forth. (R. 58-59.) When her daughters returned from school, Thurman would help her younger daughter with homework. (R. 59.) She walked up and down the steps to the bathroom four or five times a day. (R. 58.) She would sometimes cook and fold the laundry, but cleaned the house "very little." (R. 60.) Thurman reported going to church and teaching Sunday school every Sunday between 9:00 and 10:30; she would leave at 10:30 due to back pain. (R. 61.)

The ALJ asked a vocational expert if Thurman could perform work based upon the following hypothetical: an individual of Thurman's age, education, and work experience able to lift up to 10 pounds, sit for six hours, stand and walk for two hours with an at-will, sit/stand option, occasional postural activities, no pushing or pulling with the lower extremities, no repetitive right hand use, and limited to simple, repetitive tasks. (R. 75-76.) The vocational expert opined the hypothetical individual could not perform Thurman's past relevant work, but

could perform other jobs in the national economy. Id.

Thurman's attorney presented another hypothetical to the vocational expert: an individual whose standing and walking is restricted to one hour and whose sitting is restricted to less than two hours. (R. 80.) The vocational expert testified that such an individual would not be able to sustain any gainful employment. (R. 81.) Thurman's attorney also asked the vocational expert to evaluate a hypothetical individual who suffered from dizziness and was required to lay down two or three times a month for a few hours. Id. The vocational expert opined that an individual who missed work three days a month would not be able to sustain employment, but an individual who missed work one day a month could sustain a job. (R. 83.)

  C.  ALJ Decision

The ALJ found Thurman's impairments were obesity; lumbosacral sprain and strain; degenerative joint disease of the ankles, the hips, the shoulders, and the elbows; right lateral epicondylitis; dizzy spells; depression; anxiety; and coronary artery disease. (R. 17-18.) According to the ALJ, Thurman's depression, anxiety, and coronary artery disease were not severe impairments. (R. 18.) The ALJ found Thurman's obesity, lumbosacral sprain and strain, degenerative joint disease, right lateral epicondylitis, and dizzy spells were severe, but not severe enough to meet an impairment listed in Appendix 1 to Subpart P of Part 404 ("Listing of Impairments"). (R. 18.) After a review of the medical evidence, the ALJ noted Dr. Stepanuk's opinion established only that Thurman was unable to perform her past relevant work, but did not establish inability to perform all other work. (R. 24.) She further noted Dr. King's opinion that Thurman was totally disabled was reserved to the SSA, and was premature because it was based upon one examination of Thurman on the day after her car accident. (R. 24-25.) The ALJ found

Dr. Knox's opinion that Thurman could sit for only two hours a day was not supported by the evidence and was contradicted by Dr. Knox's own examination, which found "mostly normal ranges of motion." (R. 25.) The ALJ noted Dr. Wander's opinion was that of a non-examining physician given without the benefit of additional evidence in the record. Id. She found Thurman's testimony only partially credible, and her subjective complaints not sufficiently supported by the objective evidence. Id.

The ALJ determined Thurman had the RFC to lift up to 10 pounds, sit for 6 hours, stand and walk for 2 hours with an at will sit/stand option, perform occasional postural activities, perform no pushing or pulling with the lower extremities, perform no repetitive right arm/hand uses, and perform only simple repetitive tasks. Id. The ALJ found Thurman did not have the RFC to perform her past relevant work but, based on the testimony of the vocational expert, the ALJ concluded Thurman could adjust to other work that exists in significant numbers in the national economy. (R. 25-27.)

Judge Angell found substantial evidence supported Judge McCafferty's assessment that Thurman was capable of substantial gainful activity. (R&R 16.) Judge Angell recommended that DIB be denied.

Thurman argues: (1) the ALJ should have given more weight to Dr. Knox's opinion; and (2) the ALJ had an obligation to contact Dr. Knox for an explanation of the discrepancy between his empirical observations and his conclusions. Thurman also argues the Magistrate Judge made a mistake in restating Judge McCafferty's findings, and the mistake renders the reasoning in the R&R "fatally flawed." (Pl.'s Objections to R&R 4.)

**III.   DISCUSSION**

A.     Standard of Review

When a plaintiff objects to portions of a magistrate judge's report and recommendation, a district court must review those portions *de novo*. See 28 U.S.C. § 636(b)(1)(c). The role of this court on judicial review is to determine whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); Plummer v. Apfel, 186 F. 3d 422, 427 (3d Cir. 1999). Substantial evidence is more than a mere scintilla but may be somewhat less than a preponderance of the evidence. Boone v. Barnhart, 353 F.3d 203, 205 (3d Cir. 2003). It is "such relevant evidence a reasonable mind might accept as adequate to support a conclusion." Id. It is the responsibility of the ALJ to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence. Plummer, 186 F.3d at 429; Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993). Upon appeal to this court, the ALJ's factual determinations, if supported by substantial evidence, are conclusive both as to findings of fact and inferences reasonably drawn from that evidence. See Fargnoli v. Massanari, 247 F.3d 34 (3d Cir. 2001). This standard is set so the appellate court can perform judicial review and, at the same time, avoid undue interference in the Commissioner's administrative functions. Stewart v. Secretary of Health, Educ. and Welfare, 714 F.2d 287, 290 (3d Cir. 1983).

Notwithstanding this deference due to administrative decisions in disability benefit cases, the ALJ must comport with proper procedures and apply proper legal standards. Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984). The ALJ must do more than simply state factual conclusions; he or she must include subsidiary findings to support the ultimate findings. Stewart, 714 F.3d at 290. Additionally, the ALJ must not only communicate the evidence supporting the result, but also provide some indication of the evidence rejected. Cotter v. Harris, 642 F.2d 700,

9

705 (3d Cir. 1981).

      B.      The SSA's Disability Process

In order to receive DIB, a person must be disabled for the purposes of the Act, meaning he is incapable both of continuing his previous employment and of engaging in "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Social Security Administration employs a five-step test to determine whether a person is disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. At the first step, the Commissioner determines whether the claimant is doing "substantial gainful activity." Id. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). If so, the claimant is not disabled and his application is denied. Id. At the second step, the Commissioner decides if the claimant suffers from a "severe" impairment; if the claimant's impairments are not "severe," then he is denied benefits. Id. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). At the third step, the Commissioner determines if the claimant's impairment meets or equals an impairment listed in the Listing of Impairments. Id. at §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). If so, the claimant is found disabled. Id.

At the fourth step, the Commissioner finds if the claimant has sufficient residual functional capacity to do his past relevant work; if so, the claimant is not disabled. Id. at §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). At step five, the Commissioner considers the claimant's residual functional capacity, age, education, and work experience, to determine if he can perform other work. Id. at §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he is disabled. Id. at §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v). The claimant bears the burden of proof with respect to the first four steps, then the burden shifts to the Commissioner at step five. Ramirez v. Barnhart, 372 F.3d 546, 550-51

(3d Cir. 2004).

In this case, the ALJ determined Thurman had not retained the RFC to perform her past relevant work, but she was capable of adjusting to work that existed in significant numbers in the national economy. (R. 18, 26-27.)

    C.    <u>Dr. Knox's Evaluation</u>

Thurman argues the ALJ erred because Dr. Knox's opinion was not inconsistent with his physical examination findings, and because the ALJ did not credit any medical opinion which contradicted Dr. Knox's findings. (Pl.'s Summ. J. Br. 8, 10 n.10.) Thurman's arguments do not prevail. An ALJ may reject a treating physicians' opinion on the basis of contradictory medical evidence. <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999). Although treating physicians' reports should be accorded great weight, an ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." <u>Id</u>. An ALJ can determine that the opinions of treating physicians are not controlling if they are conclusory and unsupported by the medical evidence. <u>See</u> <u>Jones v. Sullivan</u>, 954 F.2d 125, 129 (3d Cir. 1991); <u>see</u> <u>also</u> 20 C.F.R. § 404.1527(e) ("a statement by a medical source that you are 'disabled' or 'unable to work' does not mean [the SSA] will determine that you are disabled"). The ALJ found Dr. Knox's "examination note[d] mostly normal ranges of motion" despite limited ankle extension and flexion and crepitus in both knees. (R. 25.) There is no evidence for Dr. Knox's assertion that Thurman can only sit for two hours in an eight hour day. After a review of the medical evidence, Dr. Wander concluded that Dr. Knox's RFC assessment "imposes greater restrictions than the physical examination and medical evidence support." (R. 207.)

Thurman asserts the court cannot give weight to Dr. Wander's opinion because the ALJ specifically rejected Dr. Wander's RFC assessment. (Pl.'s Summ. J. Br. 2.) Thurman's characterization of the ALJ decision is inaccurate. While the ALJ noted that Dr. Wander was a non-examining physician without the benefit of the additional evidence in the record, she did not reject Dr. Wander's opinion.

The ALJ properly exercised her discretion to discredit Dr. Knox's statements about Thurman's capacity for work. Dr. Knox's opinion as to Thurman's capabilities was not supported by his observations, so the ALJ rejected it in favor of Dr. Wander's interpretation. The court finds the ALJ's decision was supported by "substantial evidence."

D.      Contacting Dr. Knox

Thurman claims that if the ALJ believed Dr. Knox's conclusions were inconsistent with his observations, she "had a duty to attempt to re-contact Dr. Knox to seek an explanation of this alleged inconsistency." (Pl.'s Summ. J. Br. 10.) She argues that under 20 C.F.R. § 404.1512(e)(1), the SSA will seek additional evidence when there is a "conflict or ambiguity that must be resolved." The Court of Appeals "has not explicitly addressed the standard governing when an ALJ is obligated to recontact a treating physician," but most cases in this circuit have concluded that "notwithstanding the deficiencies of a treating physician's opinion, the evidence on record remained 'adequate' to reach a disability determination." Rodriguez v. Barnhart, No. Civ. A. 04-5375, 2005 WL 2250797, *8 (E.D. Pa. Sept. 15, 2005). The ALJ reviewed medical reports from a number of physicians, including Dr. Stepanuk, Jr., Dr. King, and Dr. Knox. She found the RFC assessment by Dr. Knox was contradicted both by Dr. Knox's own observations and by Dr. Wander's review of the medical record. The ALJ had adequate evidence on the

record to determine that Thurman was not disabled. The ALJ was not obligated to contact Dr. Knox and request an explanation of the inconsistency between his observations and his assessment.

  E.  Alleged Misstatement in R&R

Thurman objects to a alleged misstatement in the R&R. She argues the Magistrate Judge mistakenly believed that in the ALJ's RFC assessment, the ALJ included an option for Thurman to walk around at will. (Pl.'s Objections to R&R 3-4.) Page 14 of the R&R states:

> While there is evidence that after the . . . car accident Thurman complained of back pain and stiffness that 'is exacerbated by maintaining one position for any period of time,' and by 'prolonged sitting or standing,' the ALJ addressed this limitation in her RFC assessment by allowing Thurman to sit/stand, stretch out her legs and walk around at her choosing. [citations omitted]

Contrary to the above-cited statement, the ALJ's RFC assessment factors in an option to sit/stand at will, but does not include an option to walk around at will. The ALJ's decision states: "[Thurman] retains the following residual functional capacity: [she] can lift up to 10 pounds; sit for 6 hours; stand and walk for 2 hours with an at will sit/stand option; perform occasional postural activities; perform no repetitive right arm/hand uses; and perform only simple repetitive tasks." (R. 27.)

Thurman is correct that the ALJ did not include in Thurman's RFC assessment the ability to walk around at her choosing. To the extent the R&R misstated the ALJ's RFC assessment, the R&R is incorrect.[1] Regardless of any linguistic error in the R&R, the ALJ's conclusion was supported by substantial evidence.

---

[1] Although the R&R contains one incorrect characterization of the ALJ's finding, the Magistrate Judge twice quotes the ALJ's finding correctly and in full. (R&R 6, 10.)

13

**IV.    CONCLUSION**

Magistrate Judge Angell was correct to find the ALJ's decision was supported by substantial evidence. The Report and Recommendation to grant the Commissioner's motion for summary judgment will be approved as modified by this memorandum. Thurman's motion for summary judgment will be denied.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHANNE THURMAN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **JO ANNE BARNHART** | : | **NO. 05-5447** |

## ORDER

**AND NOW**, this 18th day of September, 2007, upon consideration of Magistrate Judge Angell's Report and Recommendation, petitioner's objections thereto, the parties' cross-motions for summary judgment, and all other relevant papers, for the reasons set forth in the accompanying memorandum, it is **ORDERED**:

    1.    The Report and Recommendation is **APPROVED, except as modified by the accompanying memorandum**.

    2.    Plaintiff's objections to the report and recommendation are **OVERRULED**.

    3.    The Commissioner's motion for summary judgment is **GRANTED**.

    4.    Plaintiff's motion for summary judgment is **DENIED**.

    5.    Judgment is entered affirming the decision of the Commissioner.

                                           /s/ Norma L. Shapiro
                                                                   S.J.